All rise. Hear ye, hear ye, hear ye. The United States Court of Appeals for the Eleventh Circuit is now open for a small, about a second to the end of the hearing. The hearing is now over. Good morning. Please be seated. We're here for argument in case number 21-11459, Robert Shaw Ingram v. Warden at Holman Correctional Facility. Ms. Butner, whenever you're ready to begin. Good morning, Your Honors. May it please the Court. Good morning. For 18 months, Mr. Ingram complied with the terms of his self-negotiated plea agreement with the state of Alabama. He wore a wire. He gave incriminating statements against himself, provided information against co-defendants, and cooperated with everything that was asked of him by the police and the prosecution. When it came time for him to fulfill the last condition of that plea, he got cold feet. That morning, he went into the courtroom and hesitated. Despite that, his attorney did almost nothing other than advise him to accept the plea, to convince him to continue the path he had already taken, which would save his life. The state court's determination that there was not ineffective assistance of counsel in this case is an unreasonable determination of the facts in light of the state court record. How do you get past the fact that we have the colloquy with the trial court, where he is questioning Ingram about his decision to not testify, and including a line where the court says, you understand that you are deciding your fate relative to some extent to this case by what you are doing today, and he said, yes, sir, I do? How do you get past what the trial court, the questions of the trial court? So we get past that by the fact that we're talking about a Sixth Amendment obligation that counsel has to his client. The fact that the court is advising Mr. Ingram of his rights is not sufficient to cure the ineffective assistance of his counsel. His counsel did not ask and did not know the basis for Mr. Ingram's reluctance to testify. The court advised him of his rights, but the court can't advise him regarding strategy, the state's evidence against him, and what his likelihood and chances are in the case. So the colloquy explained the outcome potential that he could be charged, but his counsel testified at Rule 32 in the post-conviction hearing that he had no doubt that Mr. Ingram would be convicted if he went to trial. Because he had no doubt of that, he should have told Mr. Ingram that, but he didn't. But wouldn't Mr. Ingram have known about a lot of the evidence that the state had against him given his cooperation? He would have because he provided some of that evidence. However, Mr. Ingram is not able to, on his own, assess the likelihood of conviction at trial. He's reliant on his attorney for that kind of advice, to advise him of what his chances would be. And counsel testified that he had no doubt that Mr. Ingram would be convicted, but Mr. Ingram testified he was not told that. What did he say he was told? He said he was told that he should accept the plea and that he should go forward and testify. However, counsel— Did he testify, Mr. Ingram, testified at the Rule 32 hearing that he told his counsel the reasons why he was, in your words, having cold feet? The testimony—so what Mr. Ingram testified to is that he told his attorneys that he was not going to testify. He then testified that he—counsel did not ask him why or try to find out more information from him. And that's a fundamental obligation of counsel. Counsel testified that he was under the impression that Mr. Ingram thought that if nobody talked, everybody would walk. But immediately after that, counsel testified that he did not ask or know where that idea came from. And that idea came from a co-defendant in the case, Mr. Akles, who was the only co-defendant other than Mr. Boyd, who was on trial that day, who had not given incriminating statements. He had not cooperated with the police. He had not provided that information. And so having that be the source of this plan is something that counsel would need to advise Mr. Ingram about, that he has a completely different interest than this person. But Mr. Ingram was housed in the county jail with his co-defendants the entire time. Counsel had not talked to Mr. Ingram for five days leading up to the trial while his client was housed in the county jail with these co-defendants. And Mr. Ingram's context of this decision is also important to this analysis. He, his mother was dying of brain cancer. He had a baby daughter to care for. And he hears from co-defendants without contradictory advice from his attorney that he could walk. That's a significant influence on a client. How about his second reason or first reason, depending on what order you put them in, that he did not want to be labeled as a snitch while he was in the penitentiary? That is something, again, that counsel would need to advise and the colloquy would not cure. The Court could not advise Mr. Ingram about that specific concern, but counsel could. And that's probably a fair concern, though, right? I mean, honestly, that doesn't mean that he made the right call, but I don't think counsel could have reasonably said, don't worry, you won't be labeled a snitch in the penitentiary. Well, from the record, it's important just to note initially that counsel did not testify he was aware at all of that reason, that Mr. Ingram was concerned about being a snitch. Mr. Ingram testified to that in the Rule 32 testimony. But counsel, as we've said in our briefs, counsel would need to advise Mr. Ingram that he had already snitched, that he had already provided information, and his co-defendants knew that. But what about the fact that counsel did testify, that we urged him to do it, to testify? But, you know, he was the defendant, and he's so adamant in his decision, and I think you point out in your brief, maybe the gray brief, that counsel only used the word adamant once. But honestly, I'm not sure you need to use the word adamant more than once. Adamant, if he was firm in his decision, what more could counsel have done? Counsel could have advised him about his specific concerns, but again, counsel did not testify that he was aware of those. Mr. Ingram testified they did not try to find out the basis for that decision. So your argument is Mr. Ingram did not tell counsel his concern was about being labeled a snitch, and yet counsel should have advised Mr. Ingram about that concern not knowing he had that concern. The bare minimum is that counsel should have been aware of the basis for Mr. Ingram's change of heart, that he was up there to testify that he was concerned about being labeled a snitch. Counsel didn't try to find that out. Counsel testified he didn't know where these ideas came from. And the state court opinion, problematically, indicates that counsel knew of that fact, that he was concerned about being labeled a snitch. But the testimony does not bear that out. Counsel did not testify he was aware of that at all. Can I ask you to switch over a little bit to prejudice? And the Alabama Court of Criminal Appeals ruled that a certain trial court finding of fact was fatal to Mr. Ingram's claim, and that was that he would not have changed his mind. So you've got to overcome more than even clear error review because of that, but how do you do that on this record? So how we do that on this record is that the determination that there was nothing counsel could have done is what the state court said. No, no, that's not that, but that wasn't the finding. The finding was that he would not have changed his mind. And I think the record contradicts that, and there's not only Mr. Ingram's testimony. Even without Mr. Ingram's testimony, there's testimony of his family. And I think if you look at the context also, that Mr. Ingram had already cooperated and already entered into this agreement. There's no indication other than his concerns right before the hearing that he would have not continued to cooperate. I'll give you my perspective. My perspective is that the record, as you've described it, would have permitted a contrary finding If the trial court had found Mr. Ingram credible and found the testimony of his relatives persuasive, then you could have come up with a different factual finding on whether he would have changed his mind. But that doesn't mean that that finding of fact can be overturned here. Or am I wrong about that? I think I would respectfully disagree, Your Honor. I think that given the testimony, right, we look at the totality of the evidence in the Rule 32 hearing. And I think it's important to note that the determination initially that Mr. Ingram's testimony was self-serving did show up in the Court of Criminal Appeals. It wasn't — that finding wasn't noted in the circuit court opinion during post-conviction. But that finding that Mr. Ingram was adamant is only taken from counsel's testimony that he determined Mr. Ingram was adamant, but he testified he didn't know the basis for Mr. Ingram's decision. But isn't that where Judge Branch's question gets to, one of the initial questions she asked about the trial court's colloquy? You may be right that what the trial court does doesn't affect the performance side of Strickland. But why doesn't it inform the prejudice side of Strickland? I think it doesn't cure the prejudice side of Strickland because part of what you need to show under Lafleur is that Mr. Ingram would have accepted the terms of the plea. And then moving forward from that, you have a clear indication, I think there's no question in the testimony or in the record, that once Mr. Ingram did not testify, he was going to have a more severe conviction and sentence that he would have had if he had continued and accepted the plea. But surely you would acknowledge that the facts of Lafleur are significantly different because in that case, the counsel's advice was for the petitioner to reject the plea, and so there was prejudice because he rejected a plea. Here you're asking us to extend Lafleur and say that counsel is now responsible, even though counsel met with his client, as directed by the trial court, before Mr. Ingram decided not to testify and didn't find out the reason, one of the reasons, because Mr. Ingram was concerned about being a snitch, and that Mr. Ingram, against the advice of counsel, decided to reject the plea. And you also have a trial court colloquy making sure that Mr. Ingram understands the ramifications of rejecting the plea. I just don't see how we extend Lafleur to these facts to get to the prejudice, to get to Judge Jordan's question. Where is the prejudice? It's so different from Lafleur. Your Honor, I think that if you look at the underlying facts, it isn't as different from Lafleur as it might initially appear. In Lafleur, counsel's advice to his client was to reject the plea, but it was based on affirmative misadvice about what he could be convicted of had he gone to trial. And I think that's analogous here. And I think the key is that counsel advised him, based on counsel's testimony, of all the potential options, one of those being that he could be acquitted and released. And given counsel's testimony at the Rule 32 hearing, counsel had no doubt that Mr. Ingram could and would be convicted if he did not accept this plea deal, and he went to trial. And counsel urged him to accept the plea deal, and then the trial court also made it very clear to Mr. Ingram that by rejecting the plea deal, he was sealing his fate. It's just hard to understand how you can argue prejudice when Mr. Ingram was being told to take the deal at every turn. He was, but his specific basis for why he was making that decision is important. And that also goes to whether or not counsel's behavior and advice was reasonable. But he didn't share those reasons with counsel. And I guess I'm trying to figure out what you're asking us to require a lawyer to ask when this information is not volunteered to the lawyer. I think it's important that, initially, that counsel ask. And Mr. Ingram did testify they didn't try to find out more. And counsel testified he wasn't aware of where the idea came from or what the source of the idea that if nobody talked, everybody walked. He wasn't aware of that. And I think it's analogous, counsel's obligation, for example, if Mr. Ingram made this determination that morning and said that I'm not going to testify. And the reason Mr. Ingram wasn't going to testify is that he had a dream that told him that he would be acquitted. Counsel needs to know the basis of these decisions of their client in order to properly advise him. Counsel has an obligation, for example, to notify the court if they had a concern that Mr. Ingram was making this decision and he wasn't competent or that it wasn't rational. That advice that would be required of counsel for Mr. Ingram informs whether or not that advice is sufficient and meets the Sixth Amendment standard. Mr. Ingram testified clearly, and it wasn't rebutted by any other testimony, that counsel did not try to find out why. And I think the context, again, like we see from Strickland, under all the circumstances, that a reasonable trial attorney who knows that this deal is his client's only way to avoid a conviction for capital murder and very likely to avoid a death sentence did the bare minimum, if that, in order to help his client secure this deal. Isn't the bare minimum to advise him to take the deal, which counsel did, and to even go further and say, if you don't take this deal, surely one of your co-defendants will? I think that the context of that is also important. So counsel testified he wasn't sure whether or not, for example, Mr. Cox, another co-defendant, had entered into a deal at the time. And given the general advice that one of your other co-defendants will, there's no specifics. Mr. Ingram testified that he thought that counsel was bluffing about that because he had no basis for that information. But why would it be reasonable to think that counsel was bluffing? Doesn't that show where Mr. Ingram's head was? It shows that counsel had not adequately communicated to Mr. Ingram or wasn't aware enough of the circumstances surrounding this plea and agreement. And the information that counsel had and testified he had reviewed in discovery would have given him this information. Do you have any cases from the Supreme Court or this Court where it's been held that counsel has to not only give good, correct advice, but also do further investigation and argumentation into encouraging a defendant to take a certain step? I think, zooming out, Your Honor, that I think that Lafler does indicate that obligation. But also, we cite as an analogous case Wiggins, where counsel's advice is only reasonable with adequate investigation. And I think because we have that principle, it indicates that counsel cannot just say broad, general statements to their client in this kind of circumstance. If you do not have the information on which to advise your client, your advice is not reasonable. It's not effective. If I can stay on the performance side for a second. In a situation where a decision is ultimately the defendant's and no one else but the defendant's, what's the role of counsel in involving third parties, family members, to try to influence that decision as a constitutional Sixth Amendment matter? If a defendant decided not to testify at trial, at his own trial, or the opposite decided to testify, and counsel thought that either decision was a death knell for him or her, do you involve the family members in getting them to come in and try to get the defendant to change his or her mind? I think in this case, when you have the fact that counsel had no doubt Mr. Ingram would be convicted at trial, and that he knew, or he should have known, that the family had a significant connection and influence over Mr. Ingram. No, I'll assume the same thing here on your terms, that in my hypothetical, the lawyer is convinced that if the defendant testifies or doesn't testify, contrary to the lawyer's advice, a conviction is coming. Is that lawyer constitutionally obligated to bring in family members and third parties to try to convince the defendant of a different road? I think that it depends on the circumstances, what a reasonable decision would be. That is one of several things that counsel could have. And potentially breach attorney-client privilege? If the defendant tells the lawyer why he wants to take the step he or she's taking, I'm not testifying for these reasons, I'm testifying for these reasons. You bring in family members and you tell those family members what your client has told you about the potential step that he or she's taking, and you take a risk on breaching attorney-client privilege? That's, to me, that's a difficult step. So I would say, Your Honor, that in these circumstances, it's important to note that counsel testified, and it was clear from the record that this was a life-and-death decision of his client. I don't think in all circumstances there is a rule that counsel has an affirmative obligation to involve third parties. I think that in this case, under the totality of the circumstances, that would have been an effective and sufficient thing to do, but there are other indications in the record of steps counsel could have taken. Let's just say, hypothetically, we were to agree with you. What rule are you asking us to craft? How would we put this into an opinion, the role of the family, and when an attorney is obligated to go to a family member or a friend or a close advisor when the decision ultimately rests with the criminal defendant? I think, Your Honor, that in these circumstances, it's clear from the record that's specific to this case that would have been a sufficient step of one of many that we've pled in our brief. I think that this case is unique, and this case is different in that the family was specifically a source of assistance and help for counsel, and that there was no doubt that counsel did not make a strategic decision not to involve the family. How would the lawyer have known what family members to involve? I think, Your Honor, with permission, I see. No, please go right ahead. You're on our time. I think that counsel would know if he knew his client. I think that it's clear that the circumstances of this case was that Mr. Ingram's decision-making was heavily influenced by the plight of his family, which is that his mother was dying. Counsel testified, and so did Mr. Ingram's sister, Carla, that she frequently attempted to contact trial counsel to find out about what was going on with Mr. Ingram's case. I think at the bare minimum, counsel would offer to Mr. Ingram, which he did not do, who would you like to speak to? Would you like to speak to your family? Who can help you make this decision? Counsel did not do that. But then Mr. Ingram, I suspect, would have said, I've already made the decision. And then what does counsel say after that? Counsel would, again, continue to determine what the basis of that decision is. Counsel, and we're not arguing that counsel has an obligation to force Mr. Ingram to testify or to accept the terms of the plea deal. That's not what the Sixth Amendment requires, and that's not what we're arguing here. But you're asking us to hold that in certain circumstances, a lawyer to provide sufficient counsel will have to consult family members or close friends when the criminal defendant is not following the advice of counsel. We are not asking specifically for that reason. That is one among many reasons. And I think the strongest reason, even from the record, is that counsel had no doubt Mr. Ingram would be convicted if he went forward and he didn't tell Mr. Ingram that. I think that's the fundamental issue here. Extending from that, there are several other things that we plead and are demonstrated by the Rule 32 record that counsel could have and should have done. But what counsel did was not enough. Let me ask you this. Suppose counsel had approached Mr. Ingram's family and they had tried to get him and said he's not, he's reneging on the plea deal and not disclosed why, and the family tried to persuade him and he remained adamant, but counsel didn't, still had not done, according to you, adequate investigation into why Mr. Ingram was refusing to abide by the plea deal. Is that sufficient representation? Does that satisfy the Sixth Amendment? I think that would get significantly closer, Your Honor. But I think here on the facts, counsel didn't do that and didn't do any number of things that we plead and demonstrated from the Rule 32 record counsel could have done. Again, I think it's key that counsel did not know the basis. If counsel had inquired of Mr. Ingram and learned more about the fact that Mr. Ingram's mother was dying, he had a baby daughter, and he hears advice from co-defendants who he's housed in the county jail with, who are relatives of his, and he is close with, that if they don't testify, they could go home. Mr. Ingram wanted to go home, and counsel tells him that it's possible he could be acquitted and be released. So we're not saying specifically as a rule that counsel must consult the family, but under these circumstances specific to this client, Mr. Ingram, that counsel should have known the significant influence Mr. Ingram's family could have had on him, and his family testified that they would have told him, and this was uncontradicted, to do the right thing and to tell the truth. It's notable to me that family noted that this was a life and death decision. The family was aware of that, but there's no indication from counsel's testimony or from Mr. Ingram's that counsel told him, you will die, or you will get a death sentence in this case if you do not testify. All right, Ms. Budger, thank you very much. You've saved all of your time for rebuttal. Thank you, Your Honors. Mr. Budger, whenever you're ready. Thank you, Judge Jordan. May it please the Court. I want to pick up on the question that you asked, Judge Jordan, about when the Constitution requires family to be involved. And this is on the deficient performance prong of Strickland. And I think one of the things that my friend did not mention up during oral argument but which they rely heavily in their briefing is turning to the ABA guidelines and when the ABA guidelines say when should family be involved. And there are a few problems with this. And the first is that they rely on the 2003 ABA guidelines and the commentary related to those guidelines to say that Mr. Ingram's counsel should have involved Mr. Ingram's family in this case. And that's problematic because, of course, we judge counsel's behavior at the time that he did it. And Mr. Ingram murdered Mr. Hughley in 1993. He breached his plea agreement in 1994 and was on trial in 1995. And yet Mr. Ingram relies on the 2003 ABA guidelines to say that family should have been involved. Really, he should have been relying on the 1989 ABA guidelines to the extent that those are relevant at all. And, of course, those don't set the standard, but they can be considered as evidence. But the 1989 guidelines don't say anything, as far as I could tell, about involving family in a defendant's plea negotiation process. Let me ask you a question. This is the one part of the case that gave me concern on the performance side, which I know the Alabama Court of Criminal Appeals did not reach. Shouldn't a lawyer in counsel's position at least inquire from the defendant about why he is taking or making a decision so contrary to an agreement he has entered into and would be beneficial to him? That doesn't seem like an onerous thing to impose on counsel. I have this relatively good plea deal. I'm not being charged with capital murder. I'm being charged with regular murder. I'm going to get a life sentence, but that life sentence gives me the possibility of parole. And then out of the blue, he says, nope, not following through with my agreement to testify against others. What's the difficulty of requiring counsel to at least inquire, why are you doing this, to then figure out what steps, if any, they should take? Well, Your Honor, I think that there was evidence at the Rule 32 hearing that counsel at least was told some of the reasons why Mr. Ingram was hesitant to testify, that Mr. Payning, his counsel at the time, testified, and Mr. Ingram said so this morning, that he understood that Mr. Ingram had gotten it in his head that if they all were silent, then they would all go home. So he had talked to his co-defendants about the prisoner's dilemma. They had concluded that if they were all going to be silent, that he would go home. And he says, he also says that, you know, he disagreed with that. He advised Mr. Ingram that, in fact, he's likely to be convicted. He advised him to keep his plea deal and to testify. But he also acknowledged that you never know what a jury is going to do. So it's not 100 percent certainty that the jury was going to convict Mr. Ingram. He said that it was likely. He advised Mr. Ingram that it was likely. It's not 100 percent. My concern is not with what he told Mr. Ingram. My concern is that Mr. Ingram testified, this part, I think, without contradiction, that his lawyers did not ask him the reasons for his decision. Mr. Fannin may have had an idea or an inkling of why, but Mr. Ingram testified, and Mr. Fannin didn't contradict him, that he wasn't asked the reasons. And even with the answer you provided, there's still the second reason of not wanting to be a snitch. Right? So what's problematic about requiring counsel to inquire? Forget about what counsel has to do to try to change someone's mind. That's a different question altogether. But, you know, the reasonable investigation aspect of the Sixth Amendment seems to be a pretty general requirement. Why not apply it here in this case to at least figure out what's motivating the client? I think two answers, Judge Jordan. One is that I want to push back a little bit on the idea that his testimony was unrebutted, that he didn't ask. I mean, Mr. Fannin, by the fact that Mr. Fannin knew at least one of the reasons why Mr. Ingram wasn't wanting to testify, you can infer, or it is reasonable for the trial court to have inferred, that there was that conversation. I think the second point — Did the trial court make that finding? Not explicitly, Your Honor. The Rule 32 court? Not explicitly, but — No, but we can't make — we have to defer her very, very greatly to State court findings of fact, but we can't make up findings of fact either. That's correct. But the court can consider justifications for the reasoning of the trial court. And so that would be one justification. I think the other point is that Mr. Ingram didn't ask Mr. Fannin at the Rule 32 hearing explicitly, did you ask him why he didn't — why he wasn't willing to testify. And that might be because there was this implied understanding that Mr. Fannin testified as to at least that one reason why Mr. Ingram was hesitant to testify. You're saying that we can't be sure really on either end of it? Either we can't be sure that he didn't ask, and we also can't be sure that the court didn't have kind of an understanding that that information was known? Well, I think on the second point, I think we can — it was pretty explicit in the testimony that Mr. Fannin testified that he understood that Mr. Ingram was not wanting to testify because he had reached that agreement that if they all were silent, they would all not — you know, they would all walk. So I think that is clearly before the trial court. And the trial court made findings about how the advice from counsel was reasonable in response to that understanding from what he had learned from Mr. Ingram or learned elsewhere. As for the silent part of the record, I would just point that it was Mr. Ingram's decision to bring the silence out and to ask his counsel why he did not do something or did do something. And so, for instance, he also — he also complains that his counsel did not ask the trial court in Mr. Boyd's trial for more time. Well, he never asked his trial counsel why they didn't ask for more time, and so it was unreasonable to find deficiency based on the silent record, based on the idea that no reasonable attorney would have done what his counsel did when we don't know why his counsel did what he did. Because Mr. Ingram, whose burden it was, didn't ask him. I think that's the same reasoning in this line of questioning. Switching gears for one second, do you know whether the State ended up introducing Mr. Ingram's testimony against him? I believe the answer is no. He was obviously advised by his attorneys and by — at least by the trial court and Mr. Boyd's trial court in that colloquy that they could have introduced that testimony, but I believe the answer is at his trial it was not actually introduced and said they relied on the testimonies of Mr. Cox, his co-defendant. To go back on the family matters, I think it's important to suggest that the guidelines don't apply. But even if they did, I think this gets to the broader question of what is reasonable for an attorney to do and when to involve family. The guidelines explain that it can be reasonable to involve family because of certain circumstances that often have it — that often occur with capital defendants, and that is that they have cognitive impairments and severe mental illness. They have severe depression or suicidality. So it's hard for the attorney to have a good, real conversation with the client. And so because of those circumstances, it might make sense under certain circumstances to involve or to ask the client if they can involve other members, family, clergy, et cetera. Here, of course, Mr. Ingram has not presented any evidence that he was suffering from any mental or cognitive deficiencies at the time. They would have put his attorneys on notice that they should be looking for family members. Didn't counsel seek a competency review? Precisely, yes. As soon as they were appointed, Mr. Fanning and Mr. Nelson sought a competency review, a mental health examination. Does that suggest that there were some concerns? Obviously, those concerns didn't bear out according to the evaluation. But does that suggest that there were some concerns that counsel had? No, Mr. Fanning testified that it was basically—they didn't—it was very early on in the arrangement. It was sort of a pro forma thing that they always did. That it was—you always get a mental health evaluation. And the fact that the mental health evaluation came back and you passed with flying colors would indicate that under these circumstances, it was not necessary to bring in family members. I also want to talk about the idea that this is the trial court, the Rule 32's finding, which is the one that we look to because the Court of Criminal Appeals did not address the deficiency components that we looked through to the last recent decision. That's the Rule 32 court. It expressly found that this court is not convinced that there was anything that his trial counsel could have done to persuade his—to persuade him to change his mind. And then quote this on page 47 of the opinion. Ingram's trial counsel met with Ingram, advised him of the consequences of his decision, warned him that one of his co-defendants would take the State's offer if he did not want to take it, and urged him to honor his agreement with the State. You're quoting from the trial court's order or from the Court of Appeals' decision? This is from the trial court's order. Got it. And so that is an explicit factual finding. Mr. Ingram has not, I don't think, even argued that any of these expressed factual findings were clearly and convincingly erroneous, which he would need to do under E-2 for them to be overturned. And, of course, they're not. And these factual findings provided a clear and reasonable basis for the trial court to find that Mr. Ingram's attorney's performance was not deficient. Turning to the prejudice analysis, here we do look to the Court of Criminal Appeals' decision, and its finding was, this is on page 12 to 13 of its order, Ingram failed to prove that any of the actions he asserted trial counsel should have undertaken would have made any difference in the outcome. And, of course, Mr. Ingram challenges that finding by questioning or hypothetically asking what else he could have done. That's not technically a — that's not a finding of fact, right? It's a mixed question of law and fact. That's fair enough. For the — I guess it does make the finding based on the trial court's factual findings. Right. Those factual findings are entitled to the deference that AEDPA gives them. But the ultimate decision on prejudice, putting aside AEDPA deference, is a mixed question of law and fact, right? Because it's not purely factual. Yes, Your Honor. Putting aside AEDPA. And then with AEDPA, the question is whether it was based on an unreasonable understanding of the facts. Application of clearly established law, right? Well, I guess I don't think his claim is that it was based on a contrary unreasonable application of clearly established law. I think the district court was right to point out that he did not bring a D-1 claim. His entire claim is D-2, that it was based on an unreasonable understanding of the facts. If that makes sense. When he — you mean in his Federal habeas petition? Yes, Your Honor. Got it. One of the arguments that Ms. Butner makes is that if you take into account Mr. Ingram's testimony and the testimony of his relatives and the reasons why he chose to not go forward with the plea agreement, it's pretty clear that he would have changed his mind. So what's the response? The response is, as the Court of Criminal Appeals found, the trial court is the trier of fact who's perfectly capable of crediting certain testimony and not crediting others. And that court credited Mr. Fanning's testimony that there was nothing that he could have done to change Mr. Ingram's mind. And it found not credible Mr. Ingram's testimony that he definitely would have listened to his family. And there was evidentiary support for that finding. For instance, in cross-examination, Mr. Ingram admits that he did all sorts of things, that he knew that his family members, and his mother in particular, would have advised him not to do. I don't think there's any doubt that his mother and his aunt and his sister definitely would have advised him not to go and sell drugs and commit murder. And he knew that, that their advice was sound. He knew it, and yet he disregarded that advice. And for that reason, the trial court had an evidentiary basis to disregard or not credit his testimony. In the same way, his sister testified that she would have come and he definitely would have listened to her because they were so close. But on cross-examination, it comes out that his sister did not even know that he was selling drugs at the time, calling into question whether they were actually as close as she thought they were at the time. Again, a reason for the trial court to not credit her testimony and instead credit Mr. Fanning's testimony. Well, again, it's one thing for a family member, perhaps, to persuade a criminal defendant is mistaken as to the law, which is what was happening here. He thought, oh, if none of us, if none of the defendants testify, then we all go free. But it's another thing entirely to suggest that family members might be able to persuade him if he is, in fact, adamant and that he has a concern about being a jailhouse snitch. I don't know how family advice shifts that concern. Yes, Your Honor. I think I agree with you there that his testimony, or at least Mr. Fanning's testimony, was that he was adamant. And he had this concern that was reasonable about being a jailhouse snitch. And it's the district court reason. So one of the arguments is that, well, his counsel or his family should have advised him that he was already going to be considered a snitch. But, I mean, there's a difference between someone who gives a statement to police right after being arrested, in his case a pretty self-serving and incomplete statement to police, versus someone who's the star witness at a murder trial and is the witness that puts away his friend for capital murder. It's reasonable to think that prisoners would view those two very different situations very differently. So, again, the Court of Criminal Appeals found that there was nothing that Mr. Fanning could have done to change his mind. Those findings are due deference. And unless the court has any other questions, we ask the court to affirm the judgment below. Thank you. All right. Thank you very much. Your Honors, I'd like to just respond to a few of those points and then address any additional questions Your Honors have. Counsel noted that Mr. Ingram cited the 2003 guidelines, indicating that that is problematic. However, in briefing, Mr. Ingram also refers to the 1989 guidelines. In those states, counsel has a general duty to have careful consultation with their client in a capital case, given the potential outcome that their client could be killed. In that context, it's important in the record, the habeas record at Document 33, Volume 42, counsel's billing records are included there. Counsel had represented Mr. Ingram for several months, and counsel had noted that the plea had already been accepted. So, Mr. Ingram self-negotiated that plea and entered into it and agreed to testify and to support the police and the DA investigation. Counsel met with Mr. Ingram four times throughout that period. And I think most importantly, leading up to what counsel had no doubt would be the best outcome, best possible outcome, best chance Mr. Ingram had to avoid a sentence of death. He met with him about trial five days before and then had no further contact. His client is housed in the county jail with his co-defendants. That should, in and of itself, indicate to counsel that there might be concerns about However, it's clear from the record, counsel did not ask. And I think, Judge Jordan, your question and your concern is exactly right. Counsel has a duty to ask the basis of this. He has an obligation to make a reasonable investigation before he gives advice to his client and before they make decisions. Because he didn't do that, he's not entitled to deference on that because there was not a reasonable basis or there wasn't a reasonable investigation supporting his advice. What do you do about the fact that all of this happened in the middle of a trial? I think that part of what you do about that fact is that you continue to have contact, consistent contact with your client leading up to that trial. I think it is not reasonable and no reasonable attorney, first of all, we say would not have, would have failed to ask Mr. Ingram the basis for this. But that counsel had insufficient contact, had not formed a relationship with Mr. Ingram, which we note in briefing all the way up and in the habeas petition. And the guidelines, of course, are not controlling precedent. They are instructive. But counsel's contact with his client, his inquiry about his client's motivations, the circumstances of his client's decision-making is insufficient. He did not do what is required of him. A lot of that seems to be hindsight because if he's entered into a favorable plea agreement and is going to testify consistently with what he's told the police, why would there be a reason for the lawyer to meet with him more than four times in a two-month period before he testifies? So he actually only met with counsel two times. You said four. Four from the beginning of the representation all the way through to the time that Mr. Ingram did not testify. Right, but you said he had represented him for two months. He had represented him for over seven months. So during that period, and one of those meetings he had with him was just specifically about the arraignment. Another was about discovery. And then his billing does note that five days before, he did meet with Mr. Ingram about testifying. I think Judge Jordan's question remains, though, why, setting aside hindsight, why would counsel in this position think that they needed to meet with their client more consistently? I think because of the stakes, and I don't think that that can be overestimated here, that if, as counsel testified, he had no doubt Mr. Ingram had no other chance other than to take this deal, I think that you have an obligation to have a close relationship with your client. How often would counsel be constitutionally required to meet with their client who had accepted a favorable plea deal? I don't think that you can draw a clear line broadly, but I do think under these circumstances, it indicates that he did not meet with him enough. How often would you say here? How many times should counsel have met with Mr. Ingram? I think he should at least have met with him about his testimony more than one time, leaving a gap of five days. Two? I think in addition to that, that you have the clear testimony that he did not find out why. I think that it's not a clear rule that he should have met with him X number of times. Did Mr. Ingram testify as to when he had made up his own mind that he was not going to follow through on the plea agreement? Mr. Ingram testified, and there is contradictory testimony between Judge Fannin, Mr. Fannin, counsel, and Mr. Ingram. Mr. Ingram testified that he informed counsel earlier. No, no, not when he informed. I know the contradictory testimony in the record on that. My question is, did Mr. Ingram testify or was he asked? When did you personally decide that you were not going to follow through on the plea agreement? He doesn't have a specific date indication, but he— Was he asked that question, though? He was not, but he testified that when he informed his counsel, which I think is the important factor here. When did he say he informed them? He said he informed them before trial, and he didn't have a specific date, but based on the billing records, I think the likely indication would be, and counsel testified he didn't have any reason to doubt that, that if he had been informed beforehand, it would have been at that meeting five days before. Let's assume that everything you're — the scenario is the client signs a favorable plea deal, and there's no contact with the — with his lawyer up until the time when he's supposed to give this testimony in another trial. Whether or not the counsel should have been in closer contact, none. It comes out when the client is supposed to testify that the client is no longer going to abide by the plea deal, is not going to testify, and the court, as the court did in this situation, says, go talk to your lawyer now. Can that one meeting potentially cure any problem on deficiency if, for example, the client had — the lawyer had asked, why are you not going to testify? Is it possible that that meeting could have been — could have cured any deficiencies that you're talking about leading up to that moment? I think there is a possibility, Your Honor. I think that had counsel even just asked the basis for that decision, he would have been able to reasonably advise Mr. Ingram about the fact that his advice that he had gotten that he couldn't — nobody could be convicted if they didn't testify was false. There's no legal basis for that. And countering the influence of his co-defendants, even just that, I think there's a reasonable probability we wouldn't be here today and Mr. Ingram would not be under a sentence of death. I think we list several things and note several things from the record that are examples of things counsel could have or should have done but did not. He could have involved the family. He could have informed him that Mr. Boyd would be convicted regardless of whether or not he testified or not. Mr. Ingram testified that that was an important factor, that he did not know and was not told. He — counsel could have, and I think this is the most important point here, asked his client why he got cold feet and had this abrupt change of heart. Counsel knows that he was blindsided and the court agreed with that. But I think that does not alleviate the requirement that counsel at the bare minimum inquire of his client why he is not only not accepting a plea but he is even out of one. I want to make sure I understand the record. Was counsel asked specifically whether he inquired with Mr. Ingram about his reasons? He was asked what counsel understood the reason for Mr. Ingram's reluctance or change of heart to testify was. And what he said was he was under the impression that counsel — or he was under the impression that Mr. Ingram learned — that Mr. Ingram thought that if he didn't testify and if nobody testified, everybody could walk. And then immediately following that, counsel says where he got that idea, I do not know. And Mr. Ingram testified that he did not get asked why. Does it matter where Mr. Ingram got that idea if counsel was, in fact, aware of the reason? I think it is — with Your Honor's permission, I'll continue to answer. I think that it is important given the circumstances. I think that it's clear from Strickland forward that counsel is required to know the circumstances and things that would influence his client. And I think it's almost common knowledge that your client who's going to be testifying against a co-defendant could be influenced by those co-defendants or be reluctant to testify. But counsel did not ask. And so he could not have advised him on strategy sufficiently. But what we do know from the record is that counsel did inform him. In light of knowing Mr. Ingram thought he could walk on this if he didn't testify, he did say you could be acquitted and be released. But that, based on only counsel's testimony, was not something he believed. He ran him through the options. And as opposing counsel has pointed out, that was, in fact, an option, however extremely unlikely it might be, correct? I think that's true, Your Honor. But I think that that's a distinction between, for example, the colloquy and what counsel's advice is required to address. The colloquy did inform Mr. Ingram. It's clear he could be acquitted. But counsel, who has the obligation to advise his client, did have no doubt, even at the time, that Mr. Ingram would be convicted. And he did not tell Mr. Ingram that. I think that is another pivotal piece of the record, that he did not tell his client, based on his assessment of the evidence and the discovery, that he would not walk, ever. He would not be acquitted. His only chance to ever go home, if that was his client's concern, was to testify and preserve his opportunity for parole. Roberts. Thank you very much. Thank you both. It's been very helpful. And we'll take the case under advisement. Thank you, Your Honor. Bye-bye.